22-8010 United States versus Hays. 22-8010. Good morning, Your Honors. And if it please the court, counsel, John Anderson, on behalf of Defendant Noel Hayes, I will take it upon myself to reserve two or three minutes of time for rebuttal, if I may. Your Honors, Mr. Hayes assigns error to two of the district court's legal conclusions underlying its denial of Mr. Hayes' motion to suppress and contends that those errors Should you pull the mic up closer to you? Thank you. There you go. You know about the button. Thank you. It contends that those errors require reversal of the denial of the motion to suppress. And I would begin, if I may, with the Rodriguez issue, which relates to the delay in the traffic stop. And, Your Honors, after Mr. Hayes was removed from the vehicle, officers conducted a pat-down search, placed him in handcuffs, which were legitimate protections to take for officer safety under Rodriguez. At that point, however, the investigation into the suspended license, which was the premise of the traffic stop, ceased. And it ceased to allow the canine to complete its free air sniff around the vehicle. And it was an approximate window of about five seconds between the time that the officer protection measures were completed You know, I've watched those videos, and it seems to me it's happening simultaneously. I mean, the dog is jumping up and alerting, and then goes on and does its final alert by sitting down. And I just don't see any delay there. Is it your position that they could have written out the ticket and finished processing the, I think it was suspended license violation, before that dog alerted? No, that's not our contention, Your Honor. Our contention is that all the time needs to be used in a productive manner. Okay, so if he was distracted for five seconds watching the dog jump up and down, that's enough for a Fourth Amendment violation. Well, I don't believe it was a distraction here, Your Honor. At the end of the handcuffing and pat-down process, Officer Norris says, Listen, you're not under arrest, you're just being detained. We submit that that represents a cessation, or at least a suspension, of the investigation into the suspended license violation. And I would point to, really, it's one of the arguments that was made in this Court's decision in Frazier, which was issued back in April of this year, in footnote one in Frazier. The Court raises, acknowledges that appellant has made that argument and declines to address it, but that argument is the idea that the investigation into the underlying traffic infraction was suspended to watch the dog complete its free air sniff. That is essentially what happened here. It was not simply a continuation of the investigation into the suspended license violation. We do believe there is a perceptible and discernible stop there. We don't believe it's simply a pause and that it was something that would continue. In fact, in the... Even if I agreed with you, which I watch in the video, I have trouble. Didn't they have a separate reason for reasonable suspicion, irrespective of the suspended license? Well, no, Your Honor. And that's the second issue that's presented here, is the question of reasonable suspicion. The District Court did find there was reasonable suspicion that Mr. Hayes was engaged in narcotics trafficking. We don't believe that that is a supported conclusion. And I'm happy to discuss why and address that. Yeah, would you, please? Absolutely, Your Honor. There are a number of points raised in the brief. And beginning, I think, chronologically, the District Court's conclusion of reasonable suspicion was based on information received from informants in Cheyenne about the defendant's involvement or alleged involvement in narcotics trafficking. And we questioned that premise of the reasonable suspicion to begin with because the District Court did not explore and draw any conclusions as to the veracity, reliability, or base knowledge of those informants. And under Gates, under Alabama v. White, and under this Court's precedent, that is... Did the officers refer to them as confidential informants? They did not, Your Honor. They referred to them as individuals in the Cheyenne area. But they were people that they knew and had been surveilling. It's not entirely clear who they were. There's no testimony specifically on who they were or what their relation to the underlying case was. The officer's testimony refers to a number of individuals who provided information. So that is not clear from the record. But in those circumstances, it is incumbent upon the District Court to consider and analyze the veracity, reliability, and basis of knowledge of those individuals. And that simply wasn't done here. Well, they said that it was from prior investigations that they knew these individuals were involved in drug trafficking and that it was your client's association with these individuals that raised the suspicion. Well, I think that's somewhat a separate line of analysis, Judge McHugh, because the District Court officer, Agent Sani, did testify that in the surveillance of the defendant, he'd seen him in the company of individuals known to be involved in drug use or drug distribution and that residents is known to be involved in drug use. And isn't all of that significant? I mean, we're only talking about reasonable suspicion. I understand it's a low bar, Your Honor. But again, there is no explanation offered in the evidence that would explain to the District Court how Officer Sani knew this. It is essentially a conclusory statement that Officer Sani— Well, did anyone at the District Court level before the District Court judge challenge that testimony? Or did we have testimony that the law enforcement officer had experience, was trained, had done a lot of drug work? There certainly was testimony laying the groundwork for— So if that officer testifies that this particular individual was known to me as someone who's been historically involved in drugs, Ms. Denbo, and no one challenges that, can't the District Court accept that testimony? Well, certainly with Ms. Denbo, there's an argument for it, but there's much more than that that was brought in before the District Court in terms of the residences that he was at, the other individuals he was associated at. And the concern there is that there is simply no explanation of how Agent Sani knew these individuals. Well, again, doesn't that have to be challenged before the District Court? It did, Your Honor, and I would point out— But it's not for us to pick it apart here. Well, I certainly think it's within this Court's purview to look at the reasonable suspicion under the totality of the circumstances and to take that consideration into account in doing so. Well, I mean, he did testify as to the basis. He said it was based on his experience in drug investigations, and from prior investigations, he knew that the homes that Mr. Hayes was visiting were drug distribution points, as he described them, and that the people he was associating with were involved in drug trafficking. I mean, his personal knowledge from prior investigations is the source. I would still submit, Your Honor, that it is simply too conclusory to support reasonable suspicion here. In other words— If you wanted more foundation, I guess I'm— I mean, what you're essentially saying is they should have given more foundation, which is a trial court objection. Well, I agree that the record of the trial court, that more could have been done in the trial court. I would point out that Mr. Hayes was proceeding pro se in this, and the district court made clear his view on that, and I agree with it. But in terms of the nature of what was said about those prior investigations, we do submit it's too conclusory. Simply, there's no explanation of how it was known. There are further infirmities, Your Honor, so for example— Well, what about—Detective Sain testified that he had phone records that showed Mr. Hayes' telephone number communicating with known drug users and drug dealers. What about that? I mean, if you wanted a copy of the phone records, I guess you could ask for it at trial, but without challenging it, he's telling the court what the basis of his suspicion was. Yes, but he's not telling the court how he knows that these numbers are associated with drug dealers. He just says— He had phone records. That's how he knows. I understand he's got phone records showing who the calls are made to, but there's no evidence indicating how he knows those other numbers are associated with drug traffickers, and that's the concern that we have. He's asking the court simply to accept the conclusion that these numbers with which Mr. Hayes' phone number has been in contact are known drug users or drug distributors or people involved in the drug trade. What he provided to the district court was, it's based on my prior experience as, I think, a DEA agent and my knowledge of the people involved in it based on prior investigations. I mean, he told you what the basis was. He told the district court what the basis was, and if there was some additional problem with that, it should have been raised before the district court. Well, I understand that, Your Honor. My contention here is that the information that was provided simply was not supportive. We're asking—this is very much a situation, and I think it goes to some of the other indicia of reasonable suspicion that the district court relied on. We're simply too close to supporting or crediting the bare conclusions of others, in this case, Agent Sani, that, yes, he was at these residences. They're known havens for drug activity. He was in contact with these other individuals. I know that based on my training and experience, and I think there was not enough meat on that bone, if you will, to credit that as part of the reasonable suspicion calculus. If we disagreed with you and we thought that there was adequate reasonable suspicion for drug trafficking, then the dog sniff doesn't really matter, does it? I would have to agree with that. If there is a reasonable suspicion supporting that as an independent basis for the traffic stop, and that is what the district court found, then the Rodriguez issue becomes moot because the traffic stop is still supported. But again, it's our position that there was not reasonable suspicion here, that there was too much reliance simply on the conclusory allegations of Agent Sani, and we believe that extends beyond the points we've already discussed to the discussions about the trips between Billings and Denver and to the travel arrangements on February 29th. Agent Sani, again, testifies that he sees the GPS make a number of short trips between Billings and Denver, and that in his training experience, those are consistent with drug trafficking activity. He does not elaborate on why that is or how his training experience informs that conclusion. Well, I mean, we have a million cases that say that that is some evidence of drug trafficking. Certainly, it's just one piece in the totality of the circumstances. Well, there are cases that discuss that. There are also cases that discuss about travel patterns and the implausibility of travel patterns not giving rise to reasonable suspicion, like Simpson, and I would rely on those. Well, not by themselves, right? Well, I think the court in Simpson says that the implausibility of travel plans can contribute to reasonable suspicion. And it can, right? Well, I think Simpson said it cannot contribute to that. The implausibility of the travel plans cannot – I'm sorry. The implausibility of travel plans can contribute to reasonable suspicion, but it cannot simply because it is a travel decision or a logistical travel pattern that a particular officer would not make. If the court has no additional questions at this time, I reserve the remainder of my time for rebuttal. Thank you. Good morning. Stephanie Sprecher representing the government. May it please the court. Counsel. I want to start with asking the court to affirm the district court's decision because although the district court didn't find this, I think it's clear that there was probable cause to pull Mr. Hayes over and to arrest him on suspicion of drug trafficking. I know that the district court found that there was reasonable suspicion, which is more than just a hunch, but what we have here, if you look at what we knew at February 29th, when the traffic stop was made, is we had a warrant for GPS tracking on the defendant's phone, which was issued by a district court magistrate. A state or federal? Federal. And I don't know that that's in the record. I know just because I tried the case. If it were state, could we rely on it? Yes, you could rely on that, as could the agents. But at that point, the agents had a judicial determination that there was probable cause that the defendant was a drug dealer and using his phone to deal drugs. That was on January 31st that they got that warrant. Before that, Agent Saney testified, and based on his 11 years of experience in investigating drug trafficking crimes, he had done seven or eight interviews about Mr. Hayes, where he found out that people were identifying Hayes as a drug dealer. They identified Hayes with a photograph. They identified that he was driving an Escalade. Two people identified the defendant's phone number itself. Several people identified Mr. Hayes as being known by the nickname G, and one person actually showed Detective Saney the text between G and themselves days before that person had been caught with drugs. So we have internal corroboration of these seven or eight individuals that are corroborating that Mr. Hayes is a drug dealer. Then the agents went further to try to corroborate what information they were getting. The agents confirmed that Mr. Hayes drove an Escalade. They confirmed that he was physically, they saw him physically associating with people that he knew, that they knew to be drug dealers. They also saw him physically at drug distribution residences. They saw later, after getting other warrants, that his number, Mr. Hayes's number, was in contact with other drug dealing numbers who lived in the 307 area code. They saw that he was in the presence of one of the confidential informants who identified him previously, and they saw him in the presence of Ms. Dembo, who they knew based on training and experience from the officers in Missoula, excuse me, in Billings, Montana, that she was a known drug dealer. And they also knew that he had a criminal history which involved drug convictions. So then... I guess my question when I was reading the facts is why didn't they arrest him at the hotel when he was throwing the bags in the car? I mean, it was like... As soon as they saw him get behind the wheel, they had probable cause to arrest. Absolutely. That's my point. Did you argue probable cause in your brief? I think we all went down the reasonable suspicion, and I kept writing in the margin, probable cause, probable cause. I didn't argue probable cause in my brief. Well, I think I said he had probable cause, but I was stuck on reasonable suspicion. But they've conceded that there was probable cause to execute the traffic stop. Sure, yes. Okay, so then the question is, was it unreasonably prolonged? Correct. Okay, and so does it matter that they pulled him over for a suspended license if they also had at least reasonable suspicion that he was a drug dealer? No, no, Your Honor. We don't even get there. And that's my point in the brief. I do... As I look at the district court's opinion, there does seem to be a sense of, well, this was not a very long traffic stop, so it couldn't have been prolonged, which I think we'll all... Would you agree that that's not the analysis? I would agree that's not the analysis. I disagree that that's exactly what the district court is saying. What he's saying is that the entire event took 3 minutes and 15 seconds, and it all occurred before any substantial steps could be made toward the citation or development of the driver under suspension violation. He's not saying that they started the investigation, essentially stopped, but it's okay because, you know, it was only 3 minutes and 15 seconds. What I understand him to be saying is that there was no deviation. There was no time to deviate or pause because the dog hit so quickly. And the dog did hit quickly. I mean, it looks like it's jumping up and down, and then it goes and sits down. So I'm not sure when we say the dog alerted. The testimony was that the final alert is when the dog sits down. But I don't even think we need to parse that out here. Do you? No, I agree, Your Honor. I don't think we get there, and I don't think the court has to address it. And if there's no further questions, I will ask the court to affirm the district court's decision below. Thank you. Well, the government must think this is a slam dunk. Right? I certainly respect what the government is doing here. Your Honors, I want to come back to the point that I left at the conclusion of my argument, which relates to the travel plans. And I, again, misstated the court. Implausible travel plans certainly can support reasonable suspicion. What can is merely unusual travel plans or plans that this court has described that the officer will not take. And that is what we have here with respect to the travel arrangements that Mr. Hayes was engaged in in February of 2020. You have a situation where part of the reasonable suspicion here was based on a series of trips between Denver and Billings, and the same is true on February 29th, the trip that was witnessed that was ultimately concluded with the traffic stop. The district court did appear to weight very heavily in its reasonable suspicion calculus these trips. And, again, Officer Sani's conclusion that these trips are consistent with drug trafficking activity. But, again, there was no explanation beyond Officer Sani's statement that my training and experience leads me to believe that this is consistent with drug trafficking activity. There was no explanation of why that is. And we believe, again, that undermines reliance on those trips as an element of the reasonable suspicion calculus. If you took out those trips entirely and you looked at the totality of the other evidence, wasn't there enough for reasonable suspicion? No, Your Honor. I go back to the points that I made earlier with respect to the conclusory nature of the statements about the individuals. And I know this court has expressed concern with the position there, but it is our position that simply saying, you know, I know from prior investigations that these individuals are engaged in drug trafficking activity really did not give the district court, again, enough meat on the bone to evaluate the meaningful nature of those contacts or what they give rise to in terms of reasonable suspicion. What about the fact that numerous people pointed to his picture and identified him and said, yeah, he deals drugs? I acknowledge that, Your Honor. But again, there was no consideration of the reliability, veracity, or basis of knowledge of those individuals. In other words, no one said, were these individuals getting some kind of benefit in terms of leniency? Were they getting a financial benefit? How did they know that? Were they simply providing information, secondhand information? Those questions were not explored. We ask this court to reverse the district court's ruling on that. Thank you. Thank you, Your Honor. We'll take this matter under advisement.